2025 IL App (2d) 2250253-U
No. 2-25-0253
Order filed September 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2007CF001213 |
| KEATON MCCRAY, | ) ) ) | Honorable Bianca Camargo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

___

JUSTICE HUTCHINSON delivered the judgment of the court.
Justice Mullen concurred in the judgment.
Justice McLaren specially concurred.

**ORDER**

¶ 1   *Held*:   The trial court did not err in granting the State's petition to deny pretrial release under the Pretrial Fairness Act, where clear and convincing evidence established that defendant posed a real and present threat to the community and no conditions could adequately mitigate that threat.

¶ 2   Defendant, Keaton McCray, appeals the judgment of the Circuit Court of Kane County, which granted the State's petition denial of pretrial release pursuant to Article 110 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-1, *et seq.*), as amended by Public Acts 101-625, § 10-255 & 102-1104, § 70 (eff. Jan. 1, 2023) ) and 102-1104, § 70 (eff. Jan. 1, 2023) (collectively the "Acts").

¶ 3                                    I. BACKGROUND

¶ 4    The State alleges that on August 10, 2006, D. D. was walking in the vicinity of Gail and Lake Street in Aurora, returning home from her shift at Walgreens. As she walked, an adult male approached her and propositioned her for sex. D.D. rebuffed the man. In response, the man produced a knife and forced D.D. into a wooded area near 124 Second Street. There, the man forced D.D. to remove her pants, whereupon he penetrated her vagina with his penis. After completing the act, the man fled the area. D.D. left too, leaving her work jacket and cell phone behind in the wooded area.

¶ 5    The next day, D.D. reported the assault to Aurora Police. She led investigators to the scene. Her cell phone and jacket remained there, undisturbed. At nearby Mercy Hospital, D.D. completed a sexual assault kit, which included vaginal DNA swabs. On March 19, 2007, the Illinois State Police returned the DNA results to Aurora Police. These results indicated the presence of a male's DNA on the swabs. However, the Illinois State Police were unable to identify any individual matching this DNA evidence. Aurora Police accordingly issued a "John Doe" warrant for the arrest of this yet unknown suspect.

¶ 6    Two and a half years later, on September 15, 2009, the Illinois State Police sent Aurora Police a case update. The March 2007 DNA matched the DNA profile of defendant, who had submitted buccal swabs in 2008 pursuant to an unrelated investigation. Despite this new evidence, investigators did not pursue charges in 2009. D.D. – who was now recovering from drug addiction, feared that cooperating with authorities at this stage would push her to relapse. Thus, there were no new developments in this case for 15 years. This changed in the summer of 2024, when an audit of the Aurora Police Department's files turned up the 2007 "John Doe" warrant.

¶ 7    Upon the warrant's rediscovery, Aurora Police assigned the case to Detective Benjamin Grabowski. Detective Grabowski contacted D.D., who agreed to cooperate in the renewed investigation. In November 2024, a grand jury indicted defendant on two counts of Aggravated Criminal Sexual Assault (Class X felonies), in violation of 720 ILCS 5/11-1.30(a)(1) and (a)(3), and one count of Criminal Sexual Assault (Class 1 felony) in violation of 720 ILCS 5/11-1.20(a)(1). Police issued a warrant for defendants arrest and took him into custody on June 3, 2025.

¶ 8    At defendant's first appearance, the State filed a petition to detain. The trial court held a hearing on that petition the same day. The State proceeded via proffer, presenting both the grand jury transcript and defendant's criminal history, as follows:

> 2006: Unlawful Possession of a Controlled Substance, a Class 4 felony, probation revoked.
>
> 2008: Unlawful Possession of a Controlled Substance; Resisting a Peace Officer, Class 4 felonies. Probation revoked and terminated unsatisfactorily.
>
> 2009: Attempted Burglary, a Class 3 felony. 24 months Illinois Department of Corrections.
>
> 2011: Home Invasion, a Class X felony. 10 years in the Illinois Department of Corrections.
>
> 2011: Criminal Sexual Abuse, a Class 4 felony. 3 years Illinois Department of Corrections.
>
> 2023: Attempted Unlawful Failure to Register, a Class A misdemeanor. 1 year of conditional discharge.
>
> 2025: Unlawful Failure to Register, a Class 3 felony, *Pending*.

¶ 9    After hearing arguments from both sides, the trial court granted the State's petition to detain, concluding that the State had met its burden that (1) defendant committed the crime alleged, (2) that he posed a real and present threat to the safety of any person or persons in the community; and (3) that no condition or combination of conditions could mitigate said threat. On June 12, 2025, defendant filed a Motion for Relief pursuant to Rule 604(h). After hearing

arguments, the court denied defendant's motion. Defendant filed a timely notice of appeal on June 16, 2025.

¶ 10                                    II. ANALYSIS

¶ 11                               A. General Principles

¶ 12        If charged with a detainable offense, the State may seek pretrial detention based on the defendant's dangerousness or risk of willful flight. 725 ILCS 5/110-6.1. Under the dangerousness standard, the State must prove by clear and convincing evidence that (1) "the proof is evident or the presumption great" that the defendant has committed a detainable offense, (2) "the defendant poses a real and present threat to the safety of any person or persons or to the community;" and (3) "no condition or combination of conditions" can mitigate that threat. 725 ILCS 5/110-6.1(e)(1)-(3) (West 2024). "Clear and convincing evidence is that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." *People v. Morales*, 2024 IL App (2d) 230597 ¶ 15. "Although this description is stated in terms of reasonable doubt, our courts consider clear and convincing evidence to be more than a preponderance of the evidence and not quite approaching the beyond-a-reasonable-doubt standard necessary to convict a person of a criminal offense." *People v. Craig*, 403 Ill. App. 3d 762, 768 (5th. Dist 2010). Because the parties to the pretrial detention hearing proceeded solely by proffer, our standard of review is *de novo*. *People v. Morgan*, 2025 IL 130626, ¶ 44.

¶ 13                            B. Threat Posed by Defendant

¶ 14   We do not need to address in detail whether the State has satisfied the first prong. McCray does not argue against the factor that "the proof is evident or the presumption great" that he committed the crime in question. The State's proffer, which consists of both the alleged victim's

statements and the DNA results, clears the lowered probative threshold at this stage of the proceedings.

¶ 15    We must therefore consider whether defendant poses a "real and present threat to the safety of any person or persons or to the community." 725 ILCS 5/110-6.1(e)(2). In determining whether the defendant poses such a threat, the court may consider several, non-exhaustive, factors concerning the nature and characteristics of the crime and of the defendant, including (1) "whether the offense is a crime of violence, involving a weapon, or a sex offense," (2) the defendant's criminal history "indicative of violent, abusive, or assaultive behavior," and (3) the "[t]he identity of any person or persons to whose safety defendant is believed to pose a threat." *Id*. at (g).

¶ 16    The alleged crime was a violent sex offense involving a weapon, a type of crime that the legislature specifically identified above in setting forth these factors. *See id* at (g)(2)(A). Defendant's criminal history, moreover, includes convictions for sexual assault, attempted burglary, and home invasion. The prior sexual assault conviction reveals a predilection for sex crimes. This predilection, when considered in tandem with the randomness of the alleged assault here, suggests that any woman could find herself in peril should she encounter defendant at the wrong place, and at the wrong time. Furthermore, defendant's convictions for home invasion and attempted burglary illustrates that defendant is both able and willing to commit offenses inside of his victims' homes. This latter tendency, we believe, places D.D. at a particular risk. Her testimony could place defendant back in prison, and this presents defendant with a clear motive to silence her. This motive, considered alongside defendant's history, means that potentially nowhere is safe for D.D. so long as defendant remains out of custody.

¶ 17    In his brief, defendant argues that the police's failure to arrest him in 2009, when the DNA match made him a suspect, precludes detaining him now. Defendant's argument is, in essence, as

follows: if he was not a danger to the community in 2009, a mere three years after the alleged crime, he cannot possibly be a danger to the community in 2025, 16 years later. This argument suffers from two main flaws. First, it assumes that defendant has been in stasis from 2009 to present. This is incorrect. Rather, defendant has spent the intervening years accumulating multiple serious felonies. These felonies, as noted, demonstrate a pattern of attacks not unlike that alleged here. If proven, the instant assault would represent an escalation in defendant's dangerousness, but not its peak. It is thus apparent why police would seek defendant's removal from the community now, after he has repeatedly demonstrated himself to be a danger to the public. Moreover, in 2009 there was the matter of D.D.'s cooperation. It was perfectly reasonable that police chose not to pursue the investigation further in that year, given that D.D., the crime's only witness, was unwilling to testify or otherwise cooperate at that time. Time and resources are both limited, and bringing defendant to trial without the chief witness' cooperation could forever preclude convicting defendant for this alleged offense.

¶ 18    Given defendant's pattern of conduct, the violent nature of the present charges, we find that defendant poses a specific and ongoing threat not only to D.D., but also to the broader community.

¶ 19                                C. Conditions of Release

¶ 20    Turning next to whether any condition or combination of conditions can mitigate the threat that defendant poses, we consider the factors provided under 725 ILCS 5/110-5(a). These factors include: (1) the weight of the evidence against defendant, (2) the nature and circumstances of the offense charged, (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the specific, real, and present threat to any person that would be posed by the defendant's release. *Id*. No one factor is dispositive. *Id*.

¶ 21　The first relevant factor we consider is the weight of the evidence against defendant. At this stage, the state's evidence appears strong. Both DNA evidence and probable victim testimony point to defendant as the assault's culprit. Defendant's criminal history also weighs against his release. In the nearly 20-years since the instant offense, defendant has accumulated multiple felony convictions, including one for sexual assault. Defendant may point to his lack of felony convictions since 2011 as evidence of his rehabilitation. This argument is less compelling, however, given that he was incarcerated for approximately half of the years since 2011.

¶ 22　As detailed in the previous section, defendant's history of both sexual assault and of home invasion illustrates a unique threat to the public, which usually can count upon relative safety within the confines of the home. Furthermore, when one considers defendant's history of violence, his demonstrated willingness to strike within the home, and his clear motive to silence or intimidate the chief witness in this case, then the uniquely dangerous position of D.D. is apparent. Put simply, defendant has little incentive to comply with any conditions the court could impose on his release.

¶ 23　Even if it were in defendant's interest to comply with conditions of pretrial release, we would have little reason to believe that he would do so. Defendant's criminal history begins and ends with failures to comply with court orders. Defendant's first two convictions carried sentences of probation. Probation was revoked in both instances; presumably because of defendant's inability or unwillingness to abide by its conditions. Evidently, this experience did not teach defendant to comply with court orders, given that defendant's most recent cases arise from his failure to properly register as a sex offender. Accordingly, only detention can adequately address the threat defendant poses.

¶ 24　While our law establishes a strong preference for pretrial release, this preference is not insurmountable. 725 ILCS 5/110-2(a) (West 2024). The State here has provided ample evidence

of defendant's history of predatory behavior and of his consistent disregard for the law. In doing so, it has carried its burden.

¶ 25                                    III. CONCLUSION

¶ 26     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 27     Affirmed.

¶ 28     JUSTICE McLAREN, specially concurring:

¶ 29     While I concur with the majority's decision to affirm the judgment of the circuit court, I write separately to voice my concerns regarding the applicable standard of review.  The majority finds the standard of review in the immediate matter to be a mandatory *de novo* review and I find this to be contrary to the clear language of binding precedent.  As I recently detailed in my special concurrence in *People v. Mondragon*, the clearest reading of our supreme court's decision in *Morgan* is that the manifest weight of the evidence standard applies to both the circuit court's factual findings and ultimate detention decision under section 110-6.1, but a reviewing court has the option to apply *de novo* review to the factual findings if the detention hearing proceeded solely by proffer.  *People v. Mondragon*, 2025 IL App (2d) 250125-U, ¶ 18-39 (McLaren, J., specially concurring).